**Marcia TYSON et al.**

v.

**WHITAKER & SON, INC.**

Supreme Judicial Court of Maine.

Oct. 19, 1979.

Bennett, Kelly & Zimmerman, P. A., by Graydon G. Stevens (orally), Portland, for plaintiffs.

Hewes, Culley, Feehan & Beals by Martica F. Sawin (orally), Peter W. Culley, Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, GODFREY, NICHOLS and GLASSMAN, JJ.

McKUSICK, Chief Justice.

The issue presented by this appeal is whether a nonresident automobile dealer can be subjected to the jurisdiction of the Maine courts for the sale of a defectively manufactured or serviced vehicle that caus-

es an accident in Maine.[1] Plaintiffs appeal from an order of the Superior Court (Cumberland County) dismissing this action for lack of personal jurisdiction over defendant. The Superior Court ruled that assertion of jurisdiction over this nonresident dealer would violate due process. We disagree and therefore sustain the appeal. We do, however, remand the case to the Superior Court for further factfinding necessary to the ultimate determination of the jurisdictional issue.

On September 5, 1972, the father of plaintiffs Marcia and Tania Tyson purchased a 1972 Chevrolet truck from defendant, Whitaker & Son, Inc., an automobile dealer in Sidney, New York.[2] At the time of the sale, the Tysons were New York residents. On July 26, 1973, while passengers in the truck traveling toward New Brunswick, Canada, plaintiffs were injured in a one-vehicle accident on the Maine Turnpike in New Gloucester. Subsequently plaintiffs moved to Florida. Thereafter, alleging that their truck's steering mechanism had failed, plaintiffs brought two actions in the Maine Superior Court, one against the truck's manufacturer, General Motors Corporation, and the other against the defendant automobile retailer.[3] In their action against defendant, now on appeal, plaintiffs alleged both breach of the warranties of merchantability and fitness and negligent "fail[ure] to properly inspect, service and maintain" the truck.

Defendant Whitaker & Son, Inc., after being served in New York State, moved to dismiss on the ground, *inter alia*, of lack of personal jurisdiction. Defendant supported its motion by its president's affidavit that it owned no property in Maine, had never solicited or transacted business in Maine, and had never shipped goods into Maine pursuant to a contract of sale. On February 1, 1979, the Superior Court dismissed the action against Whitaker & Son, Inc., holding that there were insufficient "minimum contacts" between Maine and defendant to support this state's assertion of jurisdiction over the New York dealership.

Our analysis begins with Maine's "long arm" statute, 14 M.R.S.A. § 704–A (Supp. 1978). We center our attention on subsection 2(I), by which Maine asserts adjudicatory jurisdiction in the broadest constitutional terms.[4] That section 704–A(2)(I) provides:

> **2. Causes of action.** Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts:
>
> .    .    .    .    .
>
> I. *Maintain any* other *relation to the State* or to persons or property *which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.* (Emphasis added)

---

1. Plaintiffs claim that Maine courts have jurisdiction over defendant pursuant to our "long arm" statute, 14 M.R.S.A. § 704–A (Supp. 1978).

2. Sidney, a town of approximately 5,100 people, is located near Binghamton, New York, and the Pennsylvania-New York border.

3. Plaintiffs' companion action against General Motors is still pending in Maine.

4. Before the Superior Court the parties focused on subsection 2(B)—"causing the consequences of a tortious act to occur within this State." Although the legislative history of subsection 2(B) suggests that in a products liability case a broad interpretation should be given the term "causing the consequences of a tortious act," *see* 1 Field, McKusick and Wroth, *Maine Civil Practice* § 4.10, pp. 30–32 (Supp.1977), struggling with that preliminary question of statutory construction would here be a fruitless exercise for the reason that subsection 2(I), in express terms, asserts Maine jurisdiction to the outer limits of constitutionality and the constitutional issue must be addressed even if subsection 2(B) were found to fit the present fact situation. That is not, however, to gainsay the practical and policy advantages to be derived from the legislature's specification of eight other grounds for long-arm jurisdiction, rather than relying upon a single broad catch-all phrased in constitutional terms. *See id.* at 26.

Subsection 2(I) should be read in the light of the preamble, subsection 1:

**1. Declaration of purpose.** It is declared, as a matter of legislative determination, that the public interest demands that the State provide its citizens with an effective means of redress against nonresident persons who, through certain significant minimal contacts with this State, incur obligations to citizens entitled to the state's protection. This legislative action is deemed necessary because of technological progress which has substantially increased the flow of commerce between the several states resulting in increased interaction between persons of this State and persons of other states. This section, to insure maximum protection to citizens of this State, shall be applied so as to assert jurisdiction over nonresident defendants *to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.* (Emphasis added)

█ The preamble affirms the legislature's intention that section 704–A be liberally construed "to the fullest extent permitted by the due process clause."[5] *See Labbe v. Nissen Corp.,* Me., 404 A.2d 564, 569 (1979). Other jurisdictions have similarly interpreted the reach of their "long arm" statutes to be limited only by the constitutional requirements of due process. *E. q., Avdel Corp. v. Mecure,* 58 N.J. 264, 268, 277 A.2d 207, 209 (1971); *Darby v. Superior Supply Co.,* 224 Tenn. 540, 458 S.W.2d 423 (1970); *Hill v. Zale Corp.,* 25 Utah 2d 357, 482 P.2d 332 (1971).

With the broad thrust of the preamble in mind, we next turn to the statutory provision that we here elect to apply, subsection 2(I). The question facing us is whether, in the terms of that subsection, defendant did "[m]aintain any . . . relation" to Maine "which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States." In light of the preamble's mandate that courts of Maine should assert jurisdiction "to the fullest extent permitted" by due process, we interpret the term "relation" in subsection 2(I) to be consonant with the traditional due process requirement of "minimum contacts." In other words, to determine whether our "long arm" statute provides for assertion of jurisdiction over defendant, we must decide whether such an assertion of jurisdiction would pass constitutional muster. The question of statutory construction whether the Maine legislature has provided for Maine courts to have jurisdiction over this defendant in this case becomes identical to the question whether Maine courts may constitutionally assert such jurisdiction.

Subsection 2(I)'s requirement of a "relation" between defendant and Maine grows out of the seminal decision of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There the

5. We do not read the preamble to limit the benefits of subsection 2 to only plaintiffs who are "citizens of this State." The preamble is merely "prefatory language," which sets forth the purpose of the legislature in enacting the statute. The substantive provisions of the statute—contained only in subsection 2—in no way makes a Maine residence for the plaintiff a requirement for the Maine courts to have jurisdiction over the defendant. The prefatory language in subsection 1 assists, without restricting, our construction of the broad language of subsection 2. *See Hughes Tool Co. v. Meier,* 486 F.2d 593, 596 (10th Cir. 1973); 1 Field, McKusick and Wroth, *Maine Civil Practice* § 4.10, p. 29 (Supp.1977). The unlimited language of subsection 2 should be read in the context of the usual rule that Maine courts are open to anyone, resident or nonresident, to bring transitory actions against any defendant within the jurisdiction of the Maine courts, subject only to the rule of *forum non conveniens. See White v. March,* 147 Me. 63, 67, 83 A.2d 296, 298 (1951); *cf. MacLeod v. MacLeod,* Me., 383 A.2d 39 (1978) (conditional stay of action because of *forum non conveniens* ). Certainly our "long arm" statute was intended to protect not only Maine citizens, but also nonresidents who are injured or killed in Maine—individuals for whom Maine's hospitals, homes, or public agencies may have to care. *See Watson v. Employers Liability Corp.,* 348 U.S. 66, 72, 75 S.Ct. 166, 99 L.Ed. 74 (1954). The fact that a plaintiff is a resident of another forum may be an added consideration when determining the fairness of asserting jurisdiction in Maine—a factor to be balanced with the other "fairness factors" discussed below. *See Labbe v. Nissen Corp.,* Me., 404 A.2d 564, 571 (1979).

Supreme Court set forth the fundamental standard:

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316, 66 S.Ct. at 158, quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). The Supreme Court went on in *International Shoe* to require that the defendant have some "contacts, ties or *relations*," *id.*, 326 U.S. at 319, 66 S.Ct. 154 (emphasis added), with the forum. As the Court recently rephrased it, "[A]n essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." *Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978). The Court in *Kulko* cautioned that the standards of "fairness" and "reasonableness" are "not susceptible of mechanical application . . . [and that] the facts of each case must be weighed," with the recognition that "few answers will be written 'in black and white'." *Id.*

Our analysis of the facts of this case will proceed in three steps. *See* Woods, "*Pennoyer's* Demise: Personal Jurisdiction after *Shaffer* and *Kulko* and a Modest Prediction Regarding *World-Wide Volkswagen Corp. v. Woodson*," 20 Ariz.L.Rev. 861, 881–82 (1978) [hereinafter cited as *Woods*]. We will first determine whether Maine has a legitimate governmental interest in the subject matter of this action; if Maine does, then it has the basic power to adjudicate this dispute. As the second step in our analysis we will determine whether defendant's business is such that defendant should reasonably anticipate, or not be unfairly surprised by, litigation arising in Maine from that business. Only if we have found both a legitimate governmental interest and such reasonable anticipation do we reach the third step: determination whether-the exercise of jurisdiction over defendant would comport with "traditional notions of fair play and substantial justice." In the case at bar, we are convinced that the first and second steps are satisfied. However, the third and ultimate determination, that of "fair play and substantial justice," requires further factfinding, and for that we must remand to the Superior Court.

Returning to the first stage of analysis, we find that Maine has "a minimal legitimate governmental interest in the litigation and the consequent power to decide if it is fair to assert it." *Woods, supra* at 883. The "relationship" between defendant and this state arises, in the first place, from the vehicular accident that occurred here. The likely presence of witnesses in regard to the accident and subsequent hospitalization, and other evidence in Maine, along with the potential medical creditors here, provides the required connection between "the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). Maine not only has an obvious interest in providing a forum for persons injured within its borders, but it also has an interest in the safety of all motor vehicles operated on its highways, including those, such as the Tysons', that are only transiently present in the state. Thus, in the terminology used by Professor Woods, Maine has "preliminary jurisdiction," *Woods, supra* at 908–09, justifying our proceeding to the next inquiry of whether defendant could reasonably anticipate the possibility of its being sued in Maine on account of a defect in the truck sold by it in New York.

The second stage determination is far more complicated—whether defendant purposefully engaged in activity which should have put it on notice of the possibility it would be haled into a Maine court. The primary source of complication and, for some courts, confusion, has been the Supreme Court's decision of *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The Court in *Hanson*, in the course of deciding that Florida did not have jurisdiction over a trust created in Dela-

ware, made the following statement: "[I]t is essential in each case that there be some act by which the defendant *purposefully avails itself* of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law." *Id.* at 253, 78 S.Ct. at 1240 (emphasis added). In the twenty-one years since that statement in *Hanson,* both state and federal courts have wrestled with its meaning. Some have read it literally,[6] some have equated purposeful activity with foreseeability,[7] and some have read it narrowly in order not to apply it at all.[8]

We cannot read the "purposeful activity" standard literally, for to do so would resurrect the discredited notion that jurisdiction over nonresidents rests upon their implied consent. *See International Shoe Co. v. Washington, supra,* 326 U.S. at 318–19, 66 S.Ct. 154; *Phillips v. Anchor Hocking Glass Corp., supra,* 100 Ariz. at 256, 413 P.2d at 735. Moreover, although the Supreme Court has continued to recite the *Hanson* "purposeful activity" language in its recent decisions on jurisdiction,[9] the Court itself appears to be rejecting a literal application of the *Hanson* language. Justice Marshall, writing for the Court in *Shaffer v. Heitner, supra,* said that the "purposefully avail" test was not met where the defendants had nothing at all to do with the forum state *and* where the defendants "*had no reason to expect* to be haled before a . . . court" in the forum. *Id.,* 433 U.S. at 216, 97 S.Ct. at 2586 (emphasis added).[10] In his concurring opinion in *Shaffer,* Justice Stevens emphasized that the critical due process requirement was one of "fair notice," *id.*

at 217–18, 97 S.Ct. 2569, similar to Justice Marshall's "reasonable expectation." As articulated by Justice Stevens, "The requirement of fair notice . . . includes fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereign." *Id.* at 218, 97 S.Ct. at 2587. And in its latest pronouncement on jurisdiction, *Kulko v. California Superior Court, supra,* 436 U.S. at 97–98, 98 S.Ct. 1690, the Court, again speaking through Justice Marshall, reaffirmed the *Shaffer* criterion of whether the defendant "could reasonably have anticipated" being sued in the foreign state.

The rationale underlying the "purposefully availing" requirement of *Hanson* thus appears to be that the defendant have at least fair notice or a reasonable expectation that he may be subject to suit in the foreign forum. In the case at bar, defendant would hardly have been surprised that a vehicle it sold in New York was later driven in Maine. The Chevrolet truck in question was designed and manufactured, and bought and sold, for the specific purpose of being operated on the nation's highways without regard to state boundaries. By its nature the automobile is intended to go everywhere, crossing state lines at will. Interstate travel in the Tyson vehicle was not only foreseeable; it was expectable and indeed probable. *See Reilly v. Phil Tolkan Pontiac, Inc.,* 372 F.Supp. 1205, 1207 (D.C.N.J.1974); *World-Wide Volkswagen Corp. v. Woodson,* 585 P.2d 351, 354 (Okl.1978), *cert. granted,* 440 U.S. 907, 99 S.Ct. 1212, 59 L.Ed.2d 453

6.  *E. g., Granite States Volkswagen, Inc. v. District Court,* 177 Colo. 42, 492 P.2d 624, 625–26 (1972); *Jack Pickard Dodge, Inc. v. Yarbrough,* 352 So.2d 130, 133 (Fla.App.1977).

7.  *E. g., King v. Hailey Chevrolet Co.,* 462 F.2d 63, 67 n. 4 (6th Cir. 1972); *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 376–77 (6th Cir. 1968); *Kerrigan v. Clarke Gravely Corp.,* 71 F.R.D. 480, 486 (M.D.Pa. 1975); *Hapner v. Rolf Brauchli, Inc.,* 71 Mich. App. 263, 268, 247 N.W.2d 375, 377–78 (1976).

8.  *E. g., Phillips v. Anchor Hocking Glass Corp.,* 100 Ariz. 251, 256–60, 413 P.2d 732, 735–38 (1966).

9.  *See Kulko v. California Superior Court,* 436 U.S. 84, 93–94, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner,* 433 U.S. 186, 216, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

10.  In *Shaffer,* the defendants were present or former corporate officers or directors whose only link to the forum was that they owned stock in the corporation, and the corporation had been incorporated in the forum. The plaintiff was also a nonresident of the forum.

(1979).[11] Our nation has developed a single nationwide highway system that is uninterrupted by state lines or even, to any significant extent, by the international boundaries with Mexico and Canada. At the speed limits prevailing in 1972 on the interstate highways, a single day's travel in the Tyson vehicle would take the family many hundreds of miles away from Sidney, New York, and into many other state jurisdictions.

■ Defendant's knowledge of the inherent mobility of the products it sold, together with its knowledge of the substantial amount of interstate travel made by its customers, establishes our second stage requirement of reasonable anticipation of the possibility of litigation in Maine. However, as to the ultimate determination of whether exercise by a Maine court of adjudicatory power over defendant would comport with "traditional notions of fair play and substantial justice" *in this case,* remand to the Superior Court is necessary for the development of further evidence. Our emphasis rests on the recognition that the determination of fairness *must* depend on the facts of each particular case. *See Kulko v. California, supra,* 436 U.S. at 92, 98 S.Ct. 1690. "Each case involving this jurisdictional issue must stand or fall upon its own particular facts." *Labbe v. Nissen Corp., supra* at 571.

Professor Woods has summarized some of the factors which courts in the past have commonly considered when evaluating fairness:

> [T]he relative aggressiveness of the parties, the relative economic burden of prosecuting or defending the action, the importance of the governmental interest to be vindicated, the convenience of the forum from a litigational efficiency point of view, the necessity of litigation in the chosen forum, the availability of alternative forums or alternative methods for resolving the dispute, the ·impact of the forum's choice of law doctrine, and external constitutional limitations.

*Woods, supra* at 891 (citations omitted). Applying the Woods factors to the circumstances of this case, as far as they have been developed or would appear to be true, defendant is somewhat passive in that Mr. Tyson came to defendant, purchased the truck, and later drove it to Maine. But defendant is the seller of products that are highly mobile by their own power, and it is defendant's business to seek out buyers who· are then free to operate those self-powered ·vehicles anywhere in the United States and even beyond, without regard to jurisdictional boundaries.

The relative economic burden appears to favor plaintiffs, as it would be costly for plaintiffs to transport their witnesses and evidence from Maine to New York. While defendant would also suffer costs in coming to Maine to defend itself, it is better able than plaintiffs to absorb the cost of litigation into its costs of doing business, that is, to "internalize" its costs, as the phrase is. It is thus more fair, on this criterion, to hold the litigation in Maine. *See Phillips v. Anchor Hocking Glass Corp., supra,* 100 Ariz. at 260, 413 P.2d at 738; *Duignan v. A. H. Robins Co.,* 98 Idaho 134, 138, 559 P.2d 750, 754 (1977).

Earlier we discussed the important governmental interests regarding the care and treatment of individuals who are injured in accidents within our borders and the safety of motor vehicles operated on our highways. An additional factor in favor of Maine's taking jurisdiction in this case is litigational efficiency. The defendant in the companion suit, General Motors, has not contested Maine's jurisdiction, and plaintiffs' action

---

11. At oral argument, counsel for defendant argued that a motor vehicle is no different than any other consumer product, such as a sofa, because the owner might transport the sofa with him in moving to another state. We disagree. A motor vehicle is inherently and intentionally mobile by its own power; its only reason for being is mobility. A sofa, on the other hand, is inherently immobile; its purpose for existence is to remain stationary in one spot while in use. The seller of a vehicle, therefore, has a much greater reason to anticipate interstate movement of the product he sells than the seller of a sofa or other consumer products that do not have a mobility of their own.

against it is still pending in Maine, apparently awaiting the outcome of the retail dealer's challenge to Maine's assertion of jurisdiction over it. If defendant Whitaker & Son, Inc., finally succeeds in obtaining dismissal as to it, the litigation may well have to be duplicated in New York State. Although New York is an alternative forum more convenient for defendant, it may be a less convenient forum for plaintiffs and their witnesses and a less efficient place for the trial of the entire litigation against manufacturer and retailer.

Turning to further factors bearing on the fairness of subjecting a New York automobile retailer to the jurisdiction of Maine courts, we also note the benefits derived by that retailer from the maintenance by the State of Maine of its public highway system. Defendant's market for the sale of automobiles is undoubtedly enlarged by reason of the availability to its purchasers of the nationwide highway system, including that of Maine. Defendant is not restricted to selling automobiles for use only on the highways of the State of New York.

Furthermore, defendant's market for the sale of Chevrolet automobiles is undoubtedly enlarged by the nationwide activities of General Motors. It is our understanding—subject to correction or confirmation on re-

mand—that dealers in General Motors vehicles are franchisees who participate in a nationwide system for the distribution and servicing of new cars and trucks, sharing with the manufacturer and other dealers both the benefits and the burdens of a coordinated advertising, warranty, and servicing program.[12] If the contractual relationship between General Motors and its Chevrolet dealers such as Whitaker & Son, Inc., is thus one of a joint effort in distributing Chevrolet vehicles, in our view it is impossible, for purposes of "fair play and substantial justice," to make any complete distinction between the dealer and the manufacturer.

We therefore cannot agree with the courts in *Granite States Volkswagen, Inc. v. District Court*, 177 Colo. 42, 492 P.2d 624, 625–26 (1972); *Pellegrini v. Sachs and Sons*, 522 P.2d 704, 707 (Utah 1974); and *Oliver v. American Motors Corp.*, 70 Wash.2d 875, 425 P.2d 647, 655–56 (1967), that a nonresident manufacturer may constitutionally be subjected to personal jurisdiction, but a nonresident dealer may be sued only in his own state. We do not accept the wooden application of a manufacturer-retailer distinction to the sellers of automobiles.[13] Nor are we persuaded by the reasoning ad-

---

12. General Motors itself has detailed the importance of the franchised dealer to the auto manufacturer and the reciprocal benefits provided by the manufacturer to the dealer. *See Competition and the Motor Vehicle Industry* 81–85, a study by General Motors Corporation submitted to the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, April 10, 1974. For example, the General Motors study emphasized the importance of a nationwide system of dealers:

In addition to performing the retail selling function, franchised dealers provide service facilities and stock replacement parts. . . Warranty obligations, responsibilities under the safety and emissions regulations and the increasing scope of product liability make it necessary to have an adequate number of facilities properly equipped and located to perform needed service. From the customer's point of view, service facilities must be conveniently located. Furthermore, motorists driving longer distances benefit from the existence of a national network of such facilities. Motor vehicle manufacturers have found that the franchised dealer system is the

·most dependable way of handling all of these service requirements.

*Id.* at 82. *See generally* I. Foigel and H. Gammeltoft-Hansen, *The Law of Automobile Dealers Contracts* 21–45 (1970); Kessler, "Automobile Dealer Franchises: Vertical Integration by Contract," 66 Yale L.J. 1135, 1136 (1957). *Cf. Crose v. Volkswagenwerk Aktiengesellschaft*, 88 Wash.2d 50, 558 P.2d 764, 767 (1977) (discussing the "economic realities" of the automobile industry).

13. Our rejection—both here and in *Labbe v. Nissen Corp., supra* at 571—of any wooden distinctions or rigid rules to be applied across the board is supported by Chief Justice Stone's cautionary warning in *International Shoe, supra*, 326 U.S. at 319, 66 S.Ct. at 159:

It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, *cannot be simply mechanical or quantitative.*
(Emphasis added)

**8**

vanced by the opinions for that distinction. In *Granite States*, the court held that a dealer who sells only locally has not acted in a manner "calculated to have an effect in the forum state." 492 P.2d at 625–26. Yet this ignores the facts that the automobile's special and inherent characteristic is mobility under its own power and that the dealer sells the automobile with the intention and anticipation that the owner may operate it anywhere in the United States. The requirement of a "calculated" act also rests upon a literal reading of *Hanson v. Denckla*, which we reject on the basis of more recent Supreme Court pronouncements.

In *Pellegrini*, the heart of the decision denying jurisdiction over the out-of-state dealer is the following reasoning:

> Differing from the manufacturer, a dealer . . . has little or no interest in the sale of similar products in the foreign state. While it is true that he may reasonably expect that the car will go into other states, that does not seem overly important. The counter-point is that it is also to be expected that most of the products he sells will be used where he is (in California) most of the time; and that even if one does leave, it will likely return, so that in the great preponderance of instances, the discharge of his duties as to the product will be where he is.

522 P.2d at 707. This analysis is flawed in several respects. First, it ignores the ever-growing mobility of Americans, who not only travel all over the country on vacation and business trips, but who also, on retiring or changing jobs, move their homes to other states with increasing frequency. Today, most of the motor vehicles a dealer sells may *not* remain exclusively within the state where the dealer is located. Second, the Utah court ignores the fact that the California dealer is almost always a part of a larger, nationwide network of dealers who will repair the vehicles sold by the California dealer. Both the California dealer and his customer know that the vehicle does not have to remain within California to receive the same kind of service which the California dealer promises to provide.

The Washington court in *Oliver* fell prey to the same logic employed in *Pellegrini*. The majority in *Oliver* decided that while a manufacturer knows his products will go across state boundaries, the retailer knows "that in the *normal course of business* the object sold will stay and be used reasonably near the place of sale." 425 P.2d at 656 (emphasis added). But today, it is *normal* for an automobile to cross state lines, and the dealer knows it. We agree with Justice Rosellini's dissent in *Oliver*:

> I think the courts can take judicial notice of the fact that ours is an increasingly mobile society. The transaction of interstate business is an ordinary happening, not restricted to the manufacturers of nationally-advertised products. It is obviously not at all uncommon for a negligent act to be committed in one state and the damage to occur in another; and therefore, it is not at all unforeseeable that the damage resulting from negligence can occur outside the neighborhood, city, county or state.

*Id.* at 657 (Rosellini, J., dissenting). Indeed, the two recent cases that have dealt with this question have upheld the exercise of jurisdiction over a nonresident automobile retailer. *Reilly v. Phil Tolkan Pontiac, Inc., supra; World-Wide Volkswagen Corp. v. Woodson, supra.*[14]

If the facts in this case are as we assume them to be, our conclusion that the assertion of Maine's jurisdiction will comport with "fair play and substantial justice" rests upon the combination of the following three unique characteristics of defendant's relationship to Maine and this litigation: (1) the inherent mobility of automobiles and trucks, (2) the high mobility of Americans purchasing and using these products, and (3) the participation by dealers, including defendant, in a coordinated, national program of advertising, sales, service, and distribution. Our decision is thus limited to franchised retail dealers of major auto man-

---

14. The *World-Wide Volkswagen* case, now pending before the Supreme Court of the United States, was argued orally on October 3, 1979. 48 U.S.L.W. 3173.

ufacturers, because it is the three enumerated features that conjoin to distinguish the retail motor vehicle dealer from the retail seller of other consumer products, such as sofas or coffee pots.

We cannot, based on the evidence before us, conclusively resolve the constitutional question of Maine's jurisdiction over defendant. Because this case is one of first impression in Maine, we agree with the court in *Phillips v. Anchor Hocking Glass Corp., supra*, 100 Ariz. at 261, 413 P.2d at 739, that "justice will be best served by allowing the parties the opportunity of presenting any additional evidence relevant to the issue of fairness." The parties will be free to present any evidence bearing upon the third determination of "fair play and substantial justice." Without intending to make a comprehensive catalogue of the subject matter of evidence appropriate on remand, we do suggest that the Superior Court should be informed at the very least on the nature of defendant's business, the extent and nature of its participation in General Motors' distribution, warranty and service program, and the facts bearing on relative litigational convenience.

Mindful that the jurisdictional factor of "fair play and substantial justice" can only be weighed on the facts of each case [15] to determine whether the requisite relationship between defendant and the forum state is present, the entry must be:

Appeal sustained.

Judgment of dismissal vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

Costs on appeal allowed to appellants.

ARCHIBALD, J., did not sit.

---

15. *See Labbe v. Nissen Corp., supra* at 571; *Kulko v. California Superior Court, supra*, 436 U.S. at 92, 98 S.Ct. 1690.