STATE OF MAINE       AUG 9 2002       SUPERIOR COURT
KNOX, ss.       CIVIL ACTION NO.
CV-01-062

RECEIVED AND FILED
Susan _____, Clerk

ROBYN LINDNER,       )
      Plaintiff       )
      )
v.       )
      )       **DECISION AND ORDER**
JEFFREY A. BARRY,       )
GRESHAM GROUP, INC., a Maine )
corporation; GLOVILL       )
ENTERPRISES, INC., a       )
Panamanian corporation; C.A.       )
BAUMAN, a/k/a TONY BAUMAN;)
DESTRA RISK MANAGEMENT       )
LIMITED, a Nevada corporation,       )
      Defendants       )

DONALD L. GARBRECHT
LAW LIBRARY

AUG 14 2002

The matter is before the court on the Motion for Default, Motion for Ex Parte Attachment, and Motion for Relief of the plaintiff, Robyn Lindner ("Lindner"), and the Motion to Dismiss and Motion to Dissolve Attachment of Defendants Jeffrey Barry ("Barry") and Gresham Group, Inc. ("Gresham"). For the following reasons, the Motion for Default, Motion for Attachment, Motion to Dissolve Attachment, and Motion to Dismiss are denied, and the Motion for Relief is allowed as set forth below.

## BACKGROUND

Lindner resides in Nevada, Barry's last known residence was in California, and Gresham is a Maine corporation, with a place of business in Rockport. Defendant Glovill Enterprises ("Glovill") is a Panamanian corporation, Defendant C.A. Baumann ("Baumann") is a resident of Geneva, Switzerland, and Defendant Destra Risk Management Limited ("Destra") is a Nevada Corporation, of which Barry is sole shareholder and owner.

Lindner and Barry were married for eight years when they separated in April 2000. The Second Judicial District Court of Nevada conducted a divorce trial on March 29 and 30, 2001 (Docket No. DV00-00491) (the "Divorce Action"). Subsequently, on April 23, 2001, the court (Schumacher, J.) issued its Decision After Trial in the Divorce Action.

On May 4, 2001, the court (Schumacher, J.) then allowed Barry's Motion to Reduce

Spousal Support in the Divorce Action.

On May 7, 2001, Lindner filed her First Amended Complaint[1] (Docket No. 01-01039)[2] in the Second Judicial District Court of Nevada (the "Nevada Civil Action"), and alleges fraudulent conveyance. On June 5, 2001, the court (Schumacher, J.) issued the Divorce Decree in the Divorce Action. Barry appealed that decree on July 9, 2001.[3] On July 10, 2001, Barry filed a Financial Declaration in the Divorce Action stating that he had no income. Shortly thereafter, the court awarded Lindner a Judgment for Arrears in the Divorce Action against Barry dated July 16, 2001, which awarded Lindner a total of $36,830.84, for spousal support, attorney fees, and other costs associated with the litigation of the divorce action. On August 8, 2001, the court (Steinheimer, J.) in the Nevada Civil Action issued a decision denying Barry's Motion to Dismiss on res judicata grounds.[4]

---

[1] It is entirely unclear as to when Lindner filed her original complaint, but the record suggests that it was filed in March 2001. In any event, Lindner filed the Nevada Complaint before she filed the Maine Complaint.

[2] Lindner's Nevada complaint is against Jeffrey Barry, Gresham Group, Inc., Glovill Enterprises, Inc., C.A. Bauman a/k/a Tony Bauman, and Destra Risk Management Limited, the same defendants as in this case.

[3] On September 5, 2001, the appeal was assigned to Carolyn Worrell, Settlement Judge. Apparently, the case was set for hearing in March 2002. There is nothing in the record revealing what occurred at that hearing (if it did, indeed, take place), and the court has been unable to find anything indicating that this case has yet been heard by the Nevada Supreme Court.

[4] The decision states, in pertinent part:

> The subject of the current action is the alleged fraudulent assignment of a debt. Lindner and Barry were involved in prior divorce litigation . . . . In the divorce action, the existence and validity of this assignment was an issue relevant to the amount of spousal and child support to be granted and the division of marital property.
> The assignment at issue concerns the payment of some consulting fees and residuals that were to be made to Defendant Destra . . . which is a, now defunct, company wholly owned and operated by Defendant Barry. The income is being paid by Defendant Gresham . . . . Barry, through Destra, assigned the income to Defendant Glovill . . . .
> In the divorce proceeding, Plaintiff challenged the validity of the underlying debt to Glovill by the parties. Defendant testified that he borrowed $375,000 from Glovill between 1995 and 1997, and that the funds were subsequently invested in a Brazilian business venture in which the entire amount was eventually lost. As proof of the debt, Defendant offered three promissory notes signed only by himself, and a debt restructuring agreement executed in 1999, also only signed by Defendant. Defendant offered no documentary evidence confirming receipt of the monies comprising the alleged debt. Defendant, likewise, offered no evidence that the assigned income ever reached Glovill. No proof, other than Defendant's statements was introduced showing that Glovill is even a legal entity. Defendant did not know an addressor [sic] location for Glovill, the name of a principal or contact person for Glovill, nor did Defendant provide any other proof of Glovill's existence.

Lindner then brought this action in Maine on September 10, 2001, in which she asserts that the Judgment for Arrears, together with the Decision After Trial, represents a final judgment rendered by the Nevada court which is entitled to full faith and credit in the State of Maine, and should accordingly be recognized as a Maine judgment on the issues contained therein. Lindner further asserts that Barry has made fraudulent transfers of income and other funds to various defunct businesses, and in particular to Glovill, and has otherwise assigned income in a fraudulent manner, without receiving value for the assignment, in an effort to hide his assets and other income from his child and spousal support arrearages and continuing support obligations. Specifically, Lindner alleges that Barry is currently receiving monies from Gresham, which are being fraudulently conveyed and/or concealed by the Defendants by the assignment of these funds for no consideration to Glovill.

---

Judge Schumacher held that Defendant did not establish a valid community debt. Decision After Trial filed April 23, 2001, in case DV00-00491 at page 5. Judge Schumacher further found that the underlying Glovill debt was of questionable validity. Id. at 10.

Defendant is asserting that the present action is barred by the doctrine of res judicata. The doctrine of res judicata differs slightly from that of collateral estoppel. As the Nevada Supreme Court has explained:

> Generally, the doctrine of res judicata precludes parties . . . from relitigating a cause of action or an issue which has been finally determined by a court . . . . We have recognized that there are two different species of res judicata ... issue preclusion and claim preclusion. Although often used to describe both 'species,' in its strictest sense, the term 'res judicata' refers only to claim preclusion. Pursuant to the rule of claim preclusion, a valid and final judgment on a claim precludes a second action on that claim or any part of it. Claim preclusion applies when a second suit is brought against the same party on the same claim.

Executive Mgmt. v. Ticor Title Ins. Co., 114 Nev. 823, 834-35 (1998) (citations and quotations omitted).

Res judicata or claim preclusion obviously does not apply. The existence of the debt to Glovill was an issue, relevant to the amount of spousal and child support that would be awarded, but it was not a separate claim in and of itself. The Court now considers issue preclusion.
  \*\*\*
The issue of the validity of the underlying debt to Glovill, which is the central issue in the case at bar, was litigated in the previous suit, however, the issue was not decided on the merits in the previous case.

While it is true that Judge Schumacher did not hold the assignment to be invalid, nor did she hold it to be valid. Further, the income from that assignment was imputed to Defendant in the calculation of spousal and child support.

Because Judge Schumacher did not issue a final ruling on the merits of the issue of fraudulent assignment, Plaintiff is not barred from litigating the claim by the doctrine of res judicata or collateral estoppel.

In this complaint, Lindner requests that the court issue a Maine judgment based on the terms of the Judgment For Arrears and recognize and allow execution to the plaintiff the amount of $36,830.84 (Count I); and alleges fraudulent transfer (Count II).[5] Further, she asks that the court:

A. Pursuant to 14 M.R.S.A. § 3578 (A) avoid any past transfers from Defendants Barry and Destra Risk Management to Defendants Glovill Enterprises and Tony Baumann through Defendant Gresham to the extent necessary to satisfy Plaintiff's claim of Thirty Six Thousand Eight Hundred Thirty Dollars and Eighty Four Cents ($36,830.84),

B. Pursuant to 14 M.R.S.A. § 3578 (B), grant Plaintiff's Motion for *Ex Parte* Attachment and Attachment on Trustee Process, as attached hereto, in the amount of Thirty Six Thousand Eight Hundred Thirty Dollars and Eighty Four Cents ($36,830.84) against the assets of Defendant Barry, Defendant Destra Risk Management, Defendant Baumann and Defendant Glovill Enterprises in the State of Maine, as well as attach monies due now and in the future to Defendant Barry, Defendant Destra Risk Management, Defendant Baumann and Defendant Glovill Enterprises from Defendnat Gresham pursuant to the trustee process,

C. Pursuant to 14 M.R.S.A. § 3578 (C), grant Plaintiff the following relief:

(1) An injunction against further disposition by Defendant Gresham, Defendant Barry or Defendant Destra, of monies transferred from

---

[5] In her Maine fraudulent transfer action, Lindner specifically states the following:

21. Defendant Barry has in the past, and continues to make fraudulent transfers of income, due Plaintiff as a creditor in violation of 14 M.R.S.A. § 3575 with actual intent to hinder, delay or defraud Plaintiff as a creditor.

22. In particular, Defendant Barry's assignment of income from Defendant Gresham to Glovill Enterprises, Inc., a business located in Geneva Switzerland, is a fraudulent transfer under 14 M.R.S.A. § 3575, and otherwise a fraudulent conveyance, as it is Defendant Barry's intent to hinder, delay or defraud Plaintiff as a creditor.

23. Likewise, as Defendant Barry is insolvent within definition of 14 M.R.S.A. § 3573 (1) and has removed or concealed assets, the Court may presume that Defendant Barry's intent was to hinder, delay or defraud Plaintiff as a creditor.

24. Defendant Barry's assignment of income to Glovill Enterprises is fraudulent pursuant to 14 M.R.S.A. § 3576 (1) as the assignment was made without receiving a reasonably equivalent value in exchange for the transfer and Defendant Barry was insolvent at the time of the assignment or became insolvent as a result thereof.

25. Defendant Gresham's voluntarily transfer of the funds due Defendant Barry, to Glovill Enterprises, Inc. is a fraudulent transfer within the meaning of 14 M.R.S.A. § 3575 and otherwise a fraudulent conveyance, in that the transfer is designed to aid and abet Defendant Barry in his effort to hinder, delay or defraud Plaintiff as a creditor.

4

Defendant Gresham to Glovill Enterprises, Inc. in Geneva, Switzerland;

(2) Appoint a receiver to take charge of the monies being transferred from Defendant Gresham to Glovill Enterprises, Inc.;

(3) Award Plaintiff damages in an amount not to exceed double the value of the monies transferred or concealed.

Barry filed his Motion to Dismiss on February 13, 2002 for improper venue, failure to state a claim upon which relief can be granted, and lack of personal jurisdiction.[6]

## DISCUSSION

### 1. Motion for Default

On January 11, 2002, February 15, 2002, and May 29, 2002, the plaintiff moved the court for an entry of default in her favor. The court denies this motion, as Barry has shown just cause as to why he was late in filing an answer, and there is a meritorious defense.

### 2. Motion to Dismiss for Lack of Personal Jurisdiction

"The question of jurisdiction is always fundamental, and is a question of law, involving a determination by the court of its right to proceed with the litigation." 20 AM. JUR. 2D COURTS § 54. Without personal jurisdiction, a court is powerless to proceed to an adjudication. Salisbury Cove Associates, Inc. v. Indicon Design, Ltd., 2002 WL 1046711, at *4 (D.Me. May 23, 2002), quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999). "The proper exercise of personal jurisdiction in a Maine court hinges on the satisfaction of two requirements: first, that the Maine Long-Arm Statute, 14 M.R.S.A. § 704-A (1980), confers personal jurisdiction on the court; and second, that the exercise of jurisdiction pursuant to the long-arm statute complies with constitutional due process requirements." Jackson v. Weaver, 678 A.2d 1036, 1038 (Me. 1996) (footnote omitted).

#### a. Does Maine's Long-Arm Statute Confer Personal Jurisdiction on the Court?

Maine's "long-arm statute . . . permits the exercise of personal jurisdiction over non-resident defendants to the full extent permitted by the Due Process Clause of the

---

[6] Destra joined in this Motion to Dismiss.

United States Constitution." Martin v. Deschenes, 468 A.2d 618, 619 (Me. 1983). Under the long-arm statute, 14 M.R.S.A. § 704-A,[7] Barry and Destra may fall under several provisions, namely subsections (A), (B), (F), and/or (I).

There are two "events" or "circumstances" that define Barry's relationship with Gresham and the State of Maine: (1) the "business relationship," and the "assignment relationship." Although the dynamics are not entirely clear, the record demonstrates that Barry had *some* type of "business relationship" with Gresham, whereby Barry acted as a "consultant" for Gresham, meaning that he found customers for, or referred them to, Gresham.[8] Barry and Gresham then split the profits on a percentage basis. It appears as

---

[7] The long-arm statute provides, in pertinent part:

**Persons subject to jurisdiction**

1. **Declaration of purpose.** It is declared, as a matter of legislative determination, that the public interest demands that the State provide its citizens with an effective means of redress against nonresident persons who, through certain significant minimal contacts with this State, incur obligations to citizens entitled to the state's protection. This legislative action is deemed necessary because of technological progress which has substantially increased the flow of commerce between the several states resulting in increased interaction between persons of this State and persons of other states.

    This section, to insure maximum protection to citizens of this State, shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.

2. **Causes of action.** Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

    A. The transaction of any business within this State;

    B. Doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State;

    C. The ownership, use or possession of any real estate situated in this State;

    D. Contracting to insure any person, property or risk located within this State at the time of contracting;
    ***
    F. Contracting to supply services or things within this State;
    ***
    H. Acting as a director, manager, trustee or other officer of a corporation incorporated under the laws of, or having its principal place of business within, this State.

    I. Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.

14 M.R.S.A. § 704-A (2001).

[8] In her deposition, Barbara Nystrom, Gresham's controller, tried to describe Gresham's relationship with Barry:

though this relationship continued for several years.[9] Moreover, as for the "assignment relationship," Barry sent the letter directing Gresham, in Maine, to send his payments to Glovill. Based on these facts, Barry falls under the following provisions:

    a.  14 M.R.S.A. § 704-A (2)(A) (the transaction of any business within the state) – Barry earned profits from a Maine corporation, and had enough control over money from that corporation that he could assign it to a third party;

    b.  14 M.R.S.A. § 704-A (2)(B) (doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within the state) – if Barry indeed entered into a fraudulent conveyance, then he did or caused a tortious act within this state;

    c.  14 M.R.S.A. § 704-A (2)(F) (contracting to supply services or things within the state) Barry and Destra contracted with Gresham to share profits from residuals coming from business Barry brought to Gresham;

    d.  14 M.R.S.A. § 704-A (2)(I) (maintain any other relation to the state or to persons or property which affords a basis for the exercise of jurisdiction by the courts of the state consistent with the Constitution of the United States) – this subsection has been interpreted to mean whether the defendant has sufficient 'minimum contacts' with the state. See Tyson v. Whitaker & Son, Inc., 407 A.2d 1, 3 (Me. 1979).

---

Regarding Barry's compensation:

Okay. When we took over the business in '87, Jeff had a few banks already; but they wanted new blood, I guess, in there to do the servicing of it. So he agreed to let us take over his business. He – we get a percentage of the commission. He got 90 percent of the commission for the old business, and we got 10 percent. As the years went by, the old business kind of dwindled down, and any new banks and any new business we put on, we got 90 percent and he gets 10. So that's how it's divided.

Exhibit D of the Complaint, p. 10.

Regarding Barry's duties as a "consultant":

They [consultants] find us maybe banks that might be interested. They may have connections somewhere that could get us into a certain bank or help us work the program or add to – things to the program. Just ideas, mostly.

Exhibit D of the Complaint, p. 7.

[9] Attached to Nystrom's deposition, Exhibit D of the Complaint, are tax forms indicating that Gresham, the parent corporation of Think, Inc., paid the following to Destra Risk Management:

1993: $67,801.29
1994: $74,909.12
1995: $123,564.28
1996: $139,127.45
1997: $120,215.69
1998: $105,548.63
1999: $71,672.11

This element has been sufficiently met.

### b. Constitutional Due Process Requirements

"In order for Maine to exercise personal jurisdiction over a nonresident defendant, due process requires that (1) Maine have a legitimate interest in the subject matter of [the] litigation; (2) the defendant, by his conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice." Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995). "The plaintiff bears the burden of establishing the first two prongs of this three-part legal standard." Jackson v. Weaver, 678 A.2d 1036, 1039 (Me. 1996). "If the plaintiff meets these first two prongs, the burden then shifts to the defendant, who, in order to prevail, must establish that jurisdiction is improper because it does not comport with 'traditional notions of fair play and substantial justice.'" Id., quoting Murphy, 667 A.2d at 593. "The plaintiff's evidence must be based on specific facts set forth in the record and the record is to be construed in a light most favorable to the plaintiff." Murphy, 667 A.2d at 594 (quotation and citations omitted).

"Each case involving this jurisdictional issue must stand or fall upon its own particular facts. Of necessity, this must involve some subjective value judgment by the courts." Labbe v. Nissen Corporation, 404 A.2d 564, 571 (Me. 1979) (citation omitted). The court's sole inquiry under this section "is whether the exercise of personal jurisdiction would be constitutional as a matter of due process." Architectural Woodcraft Co. v. Read, 464 A.2d 210, 212 (Me. 1983).

#### (i) First Element – Maine's Legitimate Interest in the Subject Matter of the Litigation

The question the court must answer here is whether "Maine has 'a minimal legitimate governmental interest in the litigation and the consequent power to decide if it is fair to assert it.'" Tyson v. Whitaker & Son, Inc., 407 A.2d 1, 4 (Me. 1979), quoting Woods, "Pennoyer's Demise: Personal Jurisdiction after Shaffer and Kulko and a Modest Prediction Regarding World-Wide Volkswagen Corp v. Woodson," 20 Ariz. L. Rev. 861, 883 (1978). Maine has a "manifest interest" in providing a forum for its residents to seek effective redress. See Murphy v. Keenan, 667 A.2d 591, 594 (Me. 1995); Harriman v. Demoulas Supermarket, 518 A.2d 1035, 1036 (Me. 1986); Labbe v. Nissen Corporation,

404 A.2d 564, 571 (Me. 1979). "[I]t is[, however,] generally undesirable to expend . . .
judicial resources in resolving a dispute between nonresident parties *if* such is avoidable
without depriving the plaintiff of a forum." MacLeod v. MacLeod, 383 A.2d 39, 43 (Me.
1978) (emphasis original).

Case law has delineated some of the interests Maine has in litigation matters
occurring within its borders: protection of its industries, safety of its workers, location of
witnesses and creditors within its borders, and enforcing child support obligations. See
Murphy v. Keenan, 667 A.2d 591 (Me. 1995); Jackson v. Weaver, 678 A.2d 1036, 1039
(Me. 1996); Harriman v. Demoulas Supermarket, 518 A.2d 1035, 1037 (Me. 1986);
Tyson v. Whitaker & Son, Inc., 407 A.2d 1, 4 (Me. 1979). The court finds that Maine
has a legitimate interest in enforcing statutes that prohibit fraudulent transactions, and
preventing Maine corporations, and those with whom they do business, from
participating in fraudulent transactions in Maine. See 14 M.R.S.A. § 3575 (2001), the
"Uniform Fraudulent Transfer Act." Maine "has an interest in regulating and/or
sanctioning 'parties who reach out beyond one state and create continuing relationships
and obligations with Maine citizens . . . for the consequences of their activities.'"
Electronic Media v. Pioneer Communications of America, Inc., 586 A.2d 1256, 1259
(Me. 1991), *quoting* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985). The
plaintiff has met this element.

### (ii)     Second Element – Defendants' Anticipation of Litigation in Maine

"The second prong of the analysis requires an assessment of the contacts between
the defendant and Maine." Murphy, 667 A.2d at 594. "Due process demands that the
defendant have sufficient contact with Maine to make it reasonable to require the
defendant to defend the particular suit which is brought here." Id. (quotation and
citations omitted). See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291
(1980). "[T]he defendant must 'purposefully avail itself of the privilege of conducting
activities within the forum State, thus invoking the benefits and protections of its laws.'"
Id., *quoting* Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189,
1192 (Me. 1993). "This requirement is met when a defendant purposefully directs his
activities at residents of a forum by deliberately engaging in significant activities in that

forum or by creating continuing obligations between himself and residents of the forum." Interstate Food, 622 A.2d at 1192, *citing* Burger King, 471 U.S. at 473-475. The defendant should have "clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation . . . ." World-Wide, 444 U.S. at 297, *quoting* Hanson v. Denckla, 357 U.S. 235, 253 (1958).

The Law Court has addressed this issue on numerous occasions, and the case law makes it fairly clear that in order for the court to exercise personal jurisdiction over a nonresident defendant, that defendant must have had more than a brief association or connection with the State of Maine. Compare Telford Aviation, Inc. v. Raycom National, Inc., 122 F.Supp.2d 44 (D.Me. 2000) (Alabama user of air charter services not subject to personal jurisdiction in Maine; while user made charter requests and paid fees to owner in Maine, contacts with that state were fortuitous, arising only because owner decided to administer contract from its Maine office), and Snell v. Bob Fisher Enterprises, Inc., 115 F.Supp.2d 17 (D.Me. 2000) (non-resident defendant's contact with Maine, which consisted of his out-of-state dealings with a single Maine rental company, did not amount to the continuous and systematic contacts required for general jurisdiction), and Talus Corp. v. Browne, 775 F.Supp. 23 (D.Me. 1991) (nonresident defendant's contacts with plaintiff in forum state did not constitute minimum contacts necessary to satisfy due process requirements where sole contact between defendant and plaintiff in forum state was notice of infringement letter sent by defendant to plaintiff, a resident of the forum state), and Architectural Woodcraft Co. v. Read, 464 A.2d 210, 212-213 (Me. 1983) (only contacts between nonresident defendant and Maine arose from the purchase of a staircase via telephone and mail; there was no allegation that the defendant ever set foot or conducted any other business in Maine), and MacLeod v. MacLeod, 383 A.2d 39, 42 (Me. 1978) (court held that because defendant's sole "contacts" with state were possession of a driver's license, former employer maintains headquarters there, and former wife's residence, there was not enough evidence to render him personally subject to the jurisdiction of any court located in that state), with Electronic Media v. Pioneer Communications of America, Inc., 586 A.2d 1256 (Me. 1991) (nonresident seller should have anticipated litigation in Maine, and could be subjected to long-arm jurisdiction in dispute over contract, where it entered into a $3,000 contract with Maine buyer, engaged

in discussions and negotiations with the buyer over a period of five months, sold and delivered quantity of goods to the buyer in Maine, and made assurances that it would perform under the contract), and Caluri v. Rypkema, 570 A.2d 830, 832 (Me. 1990) (nonresident defendant's agent located in Maine attempted to infiltrate the Maine market for trucking services), and Harriman v. Demoulas Supermarket, 518 A.2d 1035 (Me. 1986) (nonresident defendant's conduct in entering into and maintaining a twelve-year contractual relationship with a Maine business provided sufficient basis upon which to assert jurisdiction), and Foreside Common Development Corp. v. Bleisch, 463 A.2d 767, 769 (Me. 1983) (nonresident defendants purposefully availed themselves of benefits of conducting activities within state by traveling to state, negotiating and entering purchase and sale agreement for real estate located in state, scheduling closing in state, opening bank account in state, and traveling to state again to close account, contacts between defendants and state were sufficient to allow state to exercise personal jurisdiction).

As discussed earlier, before the court are two types of conduct in which Barry and Destra engaged in Maine. First, Barry had a "business relationship" with Gresham, which lasted for several years. As part of that relationship, Barry gave his administrative responsibilities to Gresham in exchange for a percentage of the profits. Second, Barry had the "assignment relationship" with Gresham, by which he assigned his right to those payments to Glovill.[10] In this case, because the record should be construed in favor of the plaintiff, the court finds that Barry had sufficient contacts with the State of Maine such that it would not violate due process to exercise jurisdiction over him. For several years, he acted as a "consultant" for, and collected approximately $716,955.32 from, a Maine corporation. In addition, Barry assigned his right to money from a corporation in Maine

---

[10] The Restatement and the federal courts have made a distinction between "general" and "specific" personal jurisdiction. Compare RESTATEMENT (SECOND) CONFLICT OF LAWS § 35 (2) (1988) ("A State has power to exercise judicial jurisdiction over an individual who has done business in the state, but has ceased to do business there at the time when he action is brought, with respect to causes of action arising from the business done in that state.") (specific jurisdiction), with RESTATEMENT (SECOND) CONFLICT OF LAWS § 35 (3) ("A State has power to exercise judicial jurisdiction over an individual who does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction.") (general jurisdiction). See Snell v. Bob Fisher Enterprises, Inc., 115 F.Supp.2d 17, 20-22 (D.Me. 2000). There is nothing that indicates that the Law Court has made a similar distinction.

to a third party. Moreover, the event that brought about this cause of action, namely the assignment of the money, occurred in Maine.

The plaintiff, has, therefore, satisfied this element.

### (iii)  Third Element – Fair Play and Substantial Justice

"The determination of fairness for purposes of personal jurisdiction depends upon the facts of each case." Jackson, 678 A.2d at 1039 (quotation and citation omitted). "In determining fairness, [the court should] consider the number, nature and purpose of the defendant's contacts with Maine, the connection between those contacts and the cause of action, the interest of Maine in the controversy, and the convenience to both parties." Id., *quoting* Harriman v. Demoulas Supermarkets, Inc., 518 A.2d 1035, 1038 (Me. 1986); Labbe v. Nissen Corp., 404 A.2d 564, 570 (Me. 1979). "[I]n most instances it is less unfair to require a non-resident defendant to try a case in a state in which he has voluntarily chosen to engage in business than to require a plaintiff to travel out of state and try his case in a jurisdiction which has no nexus whatsoever with the event which gave rise to the action." Labbe, 404 A.2d at 573.

Barry argues that it would offend notions of fair play and substantial justice if the court exercised jurisdiction over him. The court disagrees. Although there is nothing demonstrating that Barry has ever set foot in Maine, there is evidence suggesting that he sought out the business here in Maine, and collected almost three-quarters of a million dollars. The court finds, therefore, that this element has been satisfied, and the defendants' motion to dismiss for lack of personal jurisdiction is denied.

The court will, however, grant a stay pending the final outcome of the divorce action.

### 3.  Motion for Relief

Included in her opposition to the Defendants' Motion to Dismiss, Lindner states that if the court were to stay this matter pending the final adjudication of the Nevada divorce, she asks for the following:

> a.  An order requiring Defendant Gresham to provide a complete accounting in writing of all payments made to Defendant Glovill, since the alleged fraudulent conveyance from Defendants Barry and Destra on January 26, 2000, to present.

12

b. An order for continued accounting from Defendant Gresham of all funds which come due and owing any of the Defendants which are currently subject to the attachment held by Plaintiff up to the amount of Plaintiff's attachment ($36,830.84).

c. Pursuant to the Trustee Process in Maine, Plaintiff holds a lien over the funds disclosed by Trustee/Defendant Gresham Group, Inc., which are due and owing Defendant Glovill Enterprises, Inc. See 14 M.R.S.A. § 2603.

d. However, Plaintiff, on information and belief, alleges that monies due and owing Defendant Glovill that could potentially be used to satisfy the attachment she currently holds against Defendants Barry, Destra, C.A. Baumann and Glovill, continue to accrue on a periodic basis and are in the possession of Defendant Gresham.

e. [A]n order directing Defendant Gresham to pay into a Court trust, all funds up to the amount of Plaintiff's attachment ($36,830.84) which come due and owing to Defendants Barry, Destra, C.A. Baumann and Glovill from the date of the Defendant Gresham's disclosure which was November 29, 2001, until the litigation of this matter is complete.

It is hereby ORDERED that the proceedings are stayed until the matter is finally adjudicated in Nevada. Because the court is granting a stay, it will allow the plaintiff's motion for relief in the following manner:

1. Gresham shall provide a complete written accounting of any and all payments made to Glovill from January 26, 2000 to the date of this order.

2. Gresham shall provide a complete written accounting of any and all payments made to Glovill from the date of this order and all payments thereafter.

3. Gresham shall pay into a court trust or an escrow account agreed upon by the parties, all funds up to the amount of the plaintiff's attachment ($36,830.84) which come due and owing to Defendants Barry, Destra, C.A. Baumann and Glovill from the date of Defendant Gresham's disclosure which was November 29, 2001, until the litigation of this matter is complete.

## 4. Motion for Attachment and Motion for Dissolution of Attachment

Both motions are denied.

THE DOCKET ENTRY IS:

The plaintiff's Motion for Default is DENIED; the plaintiff's Motion for Ex Parte Attachment is DENIED; the defendants' Motion to Dismiss is DENIED; the plaintiff's Motion for Relief is ALLOWED inasfar as it pertains to staying the proceeding and requiring the trustee to account to the court and hold said money in trust.

_____
Justice, Superior Court

DATED: **July 31, 2002**

14

| Date Filed 9/10/01 | Knox County | Docket No. CV-01-062 |
|---|---|---|

Action  Foreign Judgments

|  |  |
|---|---|
| ROBYN LINDNER | JEFFREY A. BARRY,<br>GLOVILL ENTERPRISES, INC.,<br>C.A. BAUMANN a/k/a TONY BAUMANN,<br>DESTRA RISK MANAGEMENT LTD., and<br>vs. GRESHAM GROUP, INC. **(Dismissed 6/12/02)** |

| Plaintiff's Attorney<br>Joseph W. Corrigan, Esq.<br>PO Box 9546<br>Portland ME  04112<br>791-3000 | Defendant's Attorney<br>C. Donald Briggs, III, Esq.(Gresham Group)<br>247 Commercial St    **(Dismissed 6/12/02)**<br>Rockport ME  04856<br>236-0715<br><br>Mary Cooper, Esq. (Jeffrey A. Barry/ Destra<br>PO Box 190            Risk Management LTD.)<br>Camden, ME  04843   236-8836 |
|---|---|

| Date of<br>Entry |  |
|---|---|
| 9/10/01 | The following filed by Attorney Corrigan:<br>-Complaint;<br>-Motion for Ex Parte Attachment and Attachment on Trustee Process;<br>-Memorandum of Law in Support of Motion;<br>-Proposed Order; and<br>-Summary Sheet. |
| 9/10/01 | $300 jury fee paid by Attorney Corrigan. |
| 9/10/01 | Case file notice mailed to Attorney Corrigan. |
| 9/11/01 | On 9/10/01, Order Approving Ex Parte Attachment and Attachment on Trustee Process filed:<br>ORDERED that attachment in favor of Plaintiff Robyn Lindner, against Defendant Jeffrey A. Barry and Defendant Gresham Group, Inc., including Attachment on Trustee Process, is approved in the amount of Thirty Six Thousand Eight Hundred Thirty Dollars and Eighty Four Cents.($36,830.84.)<br>Dated: 9/10/01<br>William Anderson, Judge, District Court<br>Sitting in Superior Court by Designation.<br>Copy mailed to Attorney Corrigan on 9/10/01. |
| 10/10/01 | On 10/9/01, The following filed by Attorney Briggs:<br>-Answer of Defendant Gresham Group, Inc.;<br>-Motion of Defendant Gresham Group, Inc. for Dissolution of Ex Parte Attachment and Attachment on Trustee Process;<br>-Memorandum of Law in Support of Motion;<br>-Answer on Summons to Trustee;<br>-Affidavit of Barbara Nystrom; and<br>-Proposed Order. |
| 10/10/01 | Hearing on Motion of Defendant Gresham Group, Inc. for Dissolution of Ex Parte Attachment and Attachment on Trustee Process scheduled for 8:30 a.m. on 10/18/01.<br>Notice mailed to Attorneys Corrigan and Briggs and Jeffrey Barry. |